THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )   No. 23 CR 113-2 |
| | ) |
| ALEXIS DEL TORO. | )   Chief Judge Virginia M. Kendall |
| | ) |

**MEMORANDUM OPINION AND ORDER**

Law enforcement officers arrested Defendant Alexis Del Toro and recovered firearms, drugs, and other evidence of drug trafficking from his girlfriend's apartment, a bag he threw out of the apartment's window, and a bag in a vehicle in which he was travelling. Del Toro now moves to suppress that evidence, specifically the firearm found in the bag outside the window and "other evidence including money and drugs" found in the search of the apartment. (Dkt. 332; *see also* Dkts. 346, 372, 381). For the following reasons, Del Toro's Motion to Suppress [332] is denied.

**BACKGROUND**

The pertinent events occurred on April 5, 2022.[1] On that day, law enforcement officers planned to arrest Del Toro on state murder charges, which are currently pending in the Cook County Circuit Court. (*See* 402-1 at 1). Officers went to effectuate the arrest at 3929 N Kedzie Avenue, Apartment 3N. Del Toro's girlfriend, S.D., rented Apartment 3N and Del Toro partially resided there. (Dkt. 332 at 2; Dkt. 402-2 at 2–3). Officers attempted to stop Del Toro and his co-defendant, who were driving in a Toyota 4Runner. (Dkt. 402-1 at 3). After the car stopped (or rather crashed) behind the apartment, Del Toro fled into Apartment 3N. (*Id*; Dkt. 402-4 at 1:55–2:30).

---

[1] The Court was provided with the body worn camera ("BWC") footage from the officers on the scene.

1

While Del Toro remained inside Apartment 3N, officers surrounded the building. (*See* Dkt. 402-1 at 4; Dkt. 402-5 at 2:00–3:20). Del Toro threw a bag from a window; it landed on the walkway next to the building. (*Id.*; Dkt. 402-6 at 1:57–2:08; Dkt. 402-5 at 4:25–7:09). The officers eventually breached Apartment 3N's rear door—while remaining outside—and Del Toro came to the door to surrender and be arrested. (Dkt. 402-1 at 5; Dkt. 402-4 at 8:45–10:02).

Directly following Del Toro's arrest, officers then conducted what the Government contends was a protective sweep of Apartment 3N. (Dkt. 402 at 5–6; Dkt. 402-1 at 5). The officers opened the doors to rooms and closets, removed couch cushions, and encountered Del Toro's girlfriend S.D. (Dkt. 402-4 at 10:35–12:25; Dkt. 402-1 at 5). The BWC footage shows that officers spent approximately two minutes conducting this search. (Dkt. 402-4 at 10:35–12:25).

The officers then applied for a federal warrant to search Apartment 3N. (Dkt. 402 at 6–7; Dkt. 402-1 at 6; Dkt. 402-10). While they waited, at least two officers stayed with S.D. inside Apartment 3N. (Dkt. 402-7; Dkt. 402-8). S.D. took video recordings on her phone of the two officers standing in her kitchen. (*Id.*) She stated that she did not consent to their presence in her apartment without having obtained the search warrant. (Dkt. 402-7 at 0:05–51; Dkt. 402-8 at 0:01–15). Later in the day on April 5, 2022, Magistrate Judge Weisman approved a warrant authorizing a search of Apartment 3N. (Dkt. 402-9 at 2; Dkt. 402-10).

The application and affidavit supporting the search warrant outlined that federal and state law enforcement began investigating Del Toro's drug trafficking activities in or around December 2021. (Dkt. 402-10 at 3). Over the next year, Chicago Police Department ("CPD") and Drug Enforcement Agency ("DEA") officers conducted about 53 "buys" of cocaine and heroin from Del Toro. (*Id.* at 3–4). To support a finding that evidence relating to Del Toro's criminal conduct would be found at Apartment 3N, the affidavit laid out in detail four of these purchases from Del Toro—

which connected him to Apartment 3N and S.D.—and the events of the April 5, 2022 arrest. (*Id.* at 5–16).

Ultimately, the officers recovered from the bag thrown out the window: (1) a 10 mm Glock firearm; (2) a Taurus .44 Magnum revolver; (3) cocaine; (4) Oxycodone; and (5) heroin. (Dkt. 402 at 5; Dkt. 402-1 at 5–6). From their execution of the search warrant on Apartment 3N, the officers recovered: (1) marijuana; (2) cocaine base; (3) ammunition, including an empty firearm magazine; and (4) $28,490 in cash. (*Id.* at 7; Dkt. 402-9 at 2–3). Finally, the officers recovered a firearm and cocaine from a bag in the vehicle. (Dkt. 402 at 4 n.7; Dkt. 402-1 at 4; *see* Dkt. 402-5 at 5:20–55). Del Toro now moves to suppress evidence seized in Apartment 3N, and the firearms and drugs found in the bag tossed out of Apartment 3N's window. (Dkts. 332, 372, 381).

## DISCUSSION

### I. Validity of the Search Warrant

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . .[.]" Probable cause is established when, "based on the totality of the circumstances, the government presents a judge with evidence showing a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Carswell*, 996 F.3d 785, 791 (7th Cir. 2021) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). When solely an affidavit supports a search warrant, the warrant's validity rests on the strength of the affidavit. *United States v. Orozco*, 576 F.3d 745, 748 (7th Cir. 2009). Thus, the warrant affidavit may not be "bare bones" or contain solely "conclusory allegations." *United States v. Koerth*, 312 F.3d 862, 867 (7th Cir. 2002).

Here, the warrant affidavit stated that officers engaged in 53 buys of cocaine and heroin from Del Toro or his associates between December 2021 and March 2022. It outlined in detail four

3

of those buys, one of which connected Del Toro specifically to Apartment 3N and S.D. The warrant affidavit also included the arrest of Del Toro at Apartment 3N that morning, where he threw a bag from the window of the apartment and had drugs and a firearm in his vehicle.

Del Toro partially resided at Apartment 3N, rented by his girlfriend S.D., an alleged member of his drug-trafficking activities. A warrant-issuing judge may infer that drug dealing evidence will be found "where the dealer lives." *United States v. Scott*, 731 F.3d 659, 665 (7th Cir. 2013) (citing *United States v. Singleton*, 125 F.3d 1097, 1102 (7th Cir. 1997)); *see also United States v. Tavorn*, 2024 WL 2133971, at *1 (S.D. Ind. May 13, 2024) (denying motion to suppress where the warrant affidavit included details tying defendant to the house); *c.f. United States v. Shores*, 2024 WL 1739124, at *5 (N.D. Ind. Apr. 22, 2024) (denying motion to suppress evidence seized from an apartment even where the affidavit did not connect the defendant specifically to that apartment and rather to drug trafficking activities in general).

Based upon these facts, there is no doubt that the warrant-issuing judge had probable cause to grant the search of Apartment 3N for evidence of drug trafficking activities. The totality of the circumstances presented to the judge created a commonsense conclusion that there was a fair probability a search of Apartment 3N would uncover evidence of criminal activity. *Carswell*, 996 F.3d at 793.

In a similar vein, Del Toro is not entitled to a *Franks* hearing—an evidentiary hearing regarding the veracity of the information included in the search warrant application. *Franks v. Delaware*, 438 U.S. 154 (1978). To meet his burden of attaining a hearing, Del Toro would need to make a preliminary showing that: (1) the warrant affidavit contained false statements (or material omissions), (2) these false statements (or material omissions) were made intentionally or with reckless disregard for the truth, and (3) the false statements (or material omissions) were

material to the finding of probable cause.' " *United States v. Hancock*, 844 F.3d 702, 708 (7th Cir. 2016) (quoting *United States v. Mullins*, 803 F.3d 858, 861–62 (7th Cir. 2015)). Del Toro fails to make any of the three preliminary showings.

As to materiality, Del Toro argues that the officers made false statements in the warrant affidavit by omitting that they had "already searched the residence" and that they "were denied consent" to search by S.D., which "may" have resulted in Magistrate Judge Weisman not issuing the warrant. (Dkt. 332 at 4, 6). First, the warrant affidavit does in fact state that the officers made a "safety sweep of the [premises]." (Dkt. 346-1 ¶ 43). Moreover, as outlined above, the warrant-issuing judge had probable cause to issue the warrant even absent any statement or omission as to a sweep of the premises on April 5, 2022. The warrant affidavit contained no information based upon anything the officers learned from the disputed protective sweep of the apartment. *See United States v. Alexander*, 573 F.3d 465, 476 (7th Cir. 2009) ("None of the information which would support the issuance of a search warrant was based on anything the officers learned from their re-entry into the apartment."). Therefore, Del Toro fails to establish the purported omission was material. *United States v. Roland*, 60 F.4th 1061, 1065 (7th Cir. 2023) (finding that even if the defendant pointed to omitted facts, he failed to show that the omission "would alter the probable cause determination" (quoting *United States v. Woodfork*, 999 F.3d 511, 516 (7th Cir. 2021))); *United States v. Calligan*, 8 F.4th 499, 504 (7th Cir. 2021) (same); *see also United States v. Anderson*, 2024 WL 64218, at *7 (N.D. Ind. Jan. 5, 2024) ("Even if the Court includes all of the omitted information . . . the Court fails to see how probable cause would be defeated given the totality of the circumstances."). Ultimately, there was probable cause to search Apartment 3N absent the inclusion of S.D.'s lack of consent to the disputed protective sweep in the warrant affidavit.

5

Nor did Del Toro show that the omission was intentional or reckless. A hearing is not mandated absent "allegations of deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks*, 438 U.S. at 171. "Reckless disregard for the truth" means that "the officer entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012) (cleaned up). Del Toro provided no offer of proof that the officers failed to disclose anything in the affidavit that would negate probable cause or support an inference of such an intent.

a. **Good Faith Exception**

Second, even if the warrant-issuing judge erred in finding probable cause to search Apartment 3N, the evidence seized would still be admissible because the officers relied on the warrant in good faith. *Orozco*, 576 F.3d at 750; *United States v. Leon*, 468 U.S. 897 (1984). An officer's decision to obtain a warrant is *prima facie* evidence that they were acting in good faith. *United States v. Otero*, 495 F.3d 393, 398 (7th Cir. 2007).

Del Toro provides nothing to suggest that the warrant process was corrupted by the officers or the judge, or that the affidavit lacked probable cause so "that no officer could have reasonably relied on it." *United States v. Hueston*, 90 F.4th 897, 904 (7th Cir.), *cert. denied*, 144 S. Ct. 2549 (2024) (citation omitted); *Otero*, 495 F.3d at 398; *United States v. Adams*, 934 F.3d 720, 726–27 (7th Cir. 2019) ("Overcoming the presumption of good faith is no small feat, as an officer cannot ordinarily be expected to question a judge's probable cause determination.") (citation omitted)). For these reasons, Del Toro's motion for a *Franks* hearing fails.

6

## II. Protective Sweep

Del Toro further asserts that the officers seized evidence from Apartment 3N either during a protective sweep of the apartment or before the search warrant was approved. (Dkt. 332 at 4) ("All of the recovered evidence was seized after SD denied consent to search but before the search warrant was authorized."). Upon closer scrutiny, however, Del Toro does not provide bases to support this argument, nor does he create a material factual issue sufficient to grant a hearing.

First, Del Toro focuses on the impropriety of the protective sweep, which he argues the officers conducted without S.D.'s consent. (Dkt. 332 at 4). Though Del Toro initially claimed S.D. had video evidence to back this claim, (Dkt. 381), the BWC footage and two videos taken by S.D. show otherwise, (Dkts. 402-7–8). Ultimately, S.D.'s video evidence does not "soundly dispute" that the officers engaged in a protective sweep. (*See* Dkt. 381 at 3). Rather, S.D.'s video show two officers standing with her in the kitchen, while the BWC footage displays the officers conducting a search—consistent with a protective sweep—after arresting Del Toro in the doorway.

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest, and can be conducted without a search warrant if the purpose of the search is 'to protect the safety of police officers or others.' " *United States v. Schmitt*, 770 F.3d 524, 530 (7th Cir. 2014) (first quoting *Maryland v. Buie*, 494 U.S. 325 (1990); then *United States v. Burrows*, 48 F.3d 011, 1015 (7th Cir. 1995)). This exception to the Fourth Amendment "is narrowly confined to a cursory visual inspection of those places in which a person may be hiding," such as "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launches." *Id.* (quoting *Buie*, 494 U.S. at 327, 334).

Here, specific and articulable facts supported the officers' protective sweep of Apartment 3N. *See United States v. Henderson*, 748 F.3d 788, 791 (7th Cir. 2014) (collecting cases where

7

"specific and articulable facts" existed). The officers observed Del Toro run up into Apartment 3N after crashing a car behind the building. Del Toro was ostensibly dangerous: The officers knew Del Toro was involved in the drug trafficking business and they had arrived to effectuate an arrest pursuant to state first degree murder charges. Further, "guns are known tools of the drug trade and interactions with those suspected of drug trafficking present an inherent danger to law enforcement." *United States v. Thompson*, 842 F.3d 1002, 1009 (7th Cir. 2016). In fact, the officers had found a firearm in the car outside the apartment. Finally, the officers performed the sweep incident to an arrest warrant. *See United States v. Starnes*, 741 F.3d 804, 810 (7th Cir. 2013) (noting *Buie* addressed protective sweeps incident to an arrest, but further holding "the constitutionality of a protective sweep does not depend on whether that sweep is incidental to a search warrant, an arrest warrant, or a consensual search."). As such, a "reasonably prudent law enforcement official faced with this combination of facts would be concerned about his safety" when entering Apartment 3N following the arrest. *See Schmitt*, 770 at 531; *Burrows*, 48 F.3d at 1015.

Though Del Toro ultimately surrendered in the apartment's doorway, the officers' need to sweep the premises did not end at this moment. *Schmitt*, 770 at 531. The officers did not know who, if anyone else, was in Apartment 3N. *See Henderson*, 748 F.3d at 792; *U.S. v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993) (noting that "officers are as much at risk from an unexpected assault on the defendant's doorstep as they might be inside the home" and collecting cases). For example, the officers were at a heightened risk of "ambush" by effectuating the arrest on Del Toro's "turf." *Henderson*, 748 F.3d at 792–93 (collecting cases).

Moreover, consistent with a protective sweep, the BWC shows the search was brief in time and limited in nature. The sweep took about two minutes and occurred directly after officers

8

arrested Del Toro in the doorway of Apartment 3N. This finding comports with a search that did not last "longer than is necessary to dispel the reasonable suspicion of danger." *Buie*, 494 U.S. at 335–36; *Schmitt*, 770 F.3d at 532; *Henderson*, 748 F.3d at 792–93 (finding reasonable both the officers' entry into house within ten minutes after an arrest and a five minute sweep of house); *United States v. Contreras*, 820 F.3d 255, 269 (7th Cir. 2016) (upholding a protective sweep that lasted "less than a minute"); *Burrows*, 48 F.3d at 1017 (finding the protective sweep reasonable in part because the search "took no more than five minutes, an interval compatible with the officers' legitimate purpose"); *but see Xie v. City of Chicago*, 2016 WL 6193981, at *7 (N.D. Ill. Oct. 24, 2016) (finding twenty minutes "uncharacteristically long for a protective sweep").

Similarly, the officers did not search for evidence, but "merely looked for people" by opening closets, doors, and overturning the large couch cushions. *Contreras*, 820 F.3d at 269; *see United States v. Duncan*, 2021 WL 4892291, at *13 (E.D. Wis. Oct. 20, 2021) (finding protective sweep reasonable, in part, because officers looked into rooms and closets, not drawers or cabinets); *United States v. Walker*, 704 F. Supp. 3d 866, 873 (S.D. Ill. 2023) ("There is no indication . . . that they tossed the whole trailer home looking for evidence."). In fact, the officers did not uncover any evidence during the protective sweep, but rather in their search of the apartment after the search warrant. *See c.f. Contreras*, 820 F.3d at 268 (finding valid protective sweep where no evidence was found relevant only if it affected the voluntariness of defendant's consent).

Del Toro has not raised a substantial claim and shown there are disputed issues of material facts compared to what is shown in the BWC, *see Untied States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011), and instead relies on two videos that S.D. took on her cellphone while the officers waited for the search warrant. Del Toro contends that these two videos establish S.D.'s lack of consent to the protective sweep. Yet, S.D.'s consent was immaterial at this juncture. After the

9

officers conducted the sweep, S.D.'s videos show two officers standing with her in her kitchen. The officers, however, could secure Apartment 3N to prevent the destruction of evidence while they sought to obtain a search warrant—provided that they had probable cause. *Alexander*, 573 F.3d at 476 (finding a search lawful notwithstanding an individual's consent where officers were in the process of, and ultimately did obtain, a search warrant); *Segura v. United States*, 468 U.S. 796, 807–810 (1984) ("[S]ecuring a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents."). As the Court already determined, the officers had probable cause to believe Apartment 3N contained evidence of a crime and that it may be destroyed or disposed of in their absence. *See Duncan*, 2021 WL 4892291 at *14. In fact, the officers' knowledge at the time indicated that S.D. was a member of Del Toro's drug trafficking operations. (*See* Dkt. 402-2 at 3).

Finally, Del Toro baldly states that "[a]ll of the recovered evidence was seized after SD denied consent to search but before the search warrant was authorized." (Dkt. 332 at 4). Yet, the video footage submitted both by Del Toro and the Government do not support this conclusion. And Del Toro has put forth no showing that any further search took place before the warrant. Even if there was some merit to Del Toro's conclusory argument, the evidence officers seized from Apartment 3N would also be admissible pursuant to the independent legal source rule. The independent source doctrine holds that "illegally obtained evidence is admissible if the government also obtains that evidence via an independent an independent source, like a warrant." *United States v. Huskisson*, 926 F.3d 369, 374 (7th Cir. 2019); *see also Segura*, 468 U.S. at 814 (allowing the admission of evidence found in a home that was first entered illegally, but later entered based on a search warrant "wholly unconnected" to the initial, illegal entry); *Alexander*, 573 F.3d at 476

("The illegality of entry is irrelevant to the admissibility of evidence obtained through an independent source.").

Here, any purportedly illegally obtained evidence was not included in the warrant affidavit. It thus did not affect the warrant-issuing judge's decision to issue the warrant, nor did it affect the officers' decision to apply for the warrant in the first instance. *Huskisson*, 926 F.3d at 374. As evidenced by the warrant affidavit, no probable cause was created by anything the officers did while standing in the apartment with S.D. in the time period between the protective sweep and the search warrant. Thus, this argument provides no bases to suppress the evidence obtained during the search of Apartment 3N after the officers obtained the valid search warrant.

### III. Evidence Recovered from Bag Thrown From Window

The Court finds that the evidence seized from the bag Del Toro threw from the window of Apartment 3N was justified due to abandonment or the independent legal source doctrine. Thus, there is no basis to suppress the recovered firearm.[2]

First, Del Toro's actions would lead a reasonable person to believe that he abandoned the bag when he threw it out of the window. The Fourth Amendment protects individual's legitimate expectations of privacy. A person's subjective privacy expectation is legitimate if it is one that society is prepared to recognize as reasonable. *See United States v. Pitts*, 322 F.3d 449, 456 (7th Cir. 2003). Del Toro bears the burden of proving he has a legitimate expectation of privacy in the bag he threw out the window of Apartment 3N. *Alexander*, 573 F.3d at 472 (citation omitted).

Crucially, a person does not have a reasonable expectation of privacy in abandoned property. *Pitts*, 322 F.3d at 455–56. "To demonstrate abandonment, the government must prove by a preponderance of the evidence that the defendant's voluntary words or actions would lead a

---

[2] The firearm found in the bag thrown out of the window was not charged in the indictment. (Dkt. 381 at 2). Del Toro seeks to suppress it due to the possibility of its "prejudicial introduction into a forthcoming trial." (*Id.*)

11

reasonable person in the searching officer's position to believe that the defendant relinquished his property interests in the item to be searched." *Id.* at 456 (citation omitted). The test is an objective one: We consider only "the external manifestations of the defendant's intent as judged by a reasonable person possessing the same knowledge available to the" searching officer. *Id.*

Here, Del Toro fled the officers and ran into Apartment 3N for about seven minutes. In that time, the officers surrounded the apartment building. An officer observed a bag thrown from the window onto the walkway next to the apartment building. Del Toro then came to the front door to be arrested. Based on these objective facts, it was reasonable for the officers to believe that Del Toro relinquished his property interest in the bag's items by launching them out the window into a multi-unit shared walkway of an apartment building. Whether Del Toro subjectively intended to later reclaim the bag is irrelevant. *Pitts*, 322 F.3d at 456 (citing *United States v. Basinksi*, 226 F.3d 829, 836 (7th Cir. 2003)).

Even so, Del Toro does nothing to rebut that he abandoned the bag and instead notes that he threw it in the curtilage of the apartment building. (Dkt. 381 at 2). The curtilage of a home is "the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home." *United States v. Pace*, 898 F.2d 1218, 1228 (7th Cir. 1990). Whether the walkway between the multi-unit apartment building constitutes the curtilage is a fact and case-specific issue. As the Government notes, case law supports that a common area, usable by the public (and visible to the public) would not constitute an area in which Del Toro had a reasonable expectation of privacy. *See United States v. Villegas*, 495 F.3d 761, 767 (7th Cir. 2007) (finding the defendant had not demonstrated an expectation of privacy in a common hallway, or that an expectation of privacy to that common hallway is one society is prepared to recognize as reasonable); *United States v. Redmon*, 138 F.3d

1109, 1113–14 (7th Cir. 1998); *see also See United States v. Kelly*, 2021 WL 2109189, at *3 (D. Idaho May 25, 2021) (finding a grassy area between two homes where a backpack was found to not be within the curtilage of the home because it was an area to "separate" properties that was left open for public observation); *United States v. Gallardo*, 2021 WL 3206783, at *10 (D.N.M. July 29, 2021) (finding a defendant "lacked an objectively reasonable expectation of privacy in the backpack after he threw it in a bush wholly accessible to passersby and left . . . without taking any steps to secure it"). The walkway on the side of the building was visible to the street and shared by at least six units. (Dkt. 402-3). In the end, even if the walkway is the curtilage of the apartment, Del Toro did not contend that he held a reasonable expectation of privacy in the bag once he threw it out of the window when fleeing the officers.

As the final nail in the coffin to Del Toro's arguments, the items inside the bag are admissible under the independent legal source doctrine. *Huskisson*, 926 F.3d at 374; *Infra*, pp. 10–11. Here the issue is slightly more attenuated, as the warrant affidavit noted that Del Toro threw a bag from the window during his arrest. Yet, the affidavit did not state what was in the bag, and as outlined above, there was probable cause to obtain the warrant based on the detailed showing of Del Toro's drug trafficking activities and subsequent arrest at Apartment 3N absent any mention of the bag being thrown from the window. Further, the throwing of the bag had no affect on the government's decision to apply for the warrant to search Apartment 3N. *See Huskisson*, 926 F.3d at 374; Dkt. 402 at 24–25). As stated in the warrant affidavit, the officers applied for the warrant due to their training and experience that indicated drug trafficking activities often occurred inside homes, (Dkt. 402-9 at 16–19), and here Del Toro was arrested in part for those activities.

## CONCLUSION

For the reasons stated above, Del Toro's Motion to Suppress [332] is denied.

_____
Virginia M. Kendall
United States District Judge

Date: October 5, 2024